AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

3/9/23

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm  DEPUTY

United States of America

v.

DAEKUN CHO,
  aka "DK,"

Defendant

**LODGED**
CLERK, U.S. DISTRICT COURT

3/9/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

Case No.   2:23-mj-01090-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 24 and 25, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Interference with Commerce by Threats or Violence |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/_
*Complainant's signature*

Michael Choi, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____3/9/23_____

City and state:  Los Angeles, California

*Judge's signature*

Hon. Michael Wilner, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Jena MacCabe x5046

### AFFIDAVIT

I, Michael Choi, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against DAEKUN CHO, also known as "DK," ("CHO") for a violation of 18 U.S.C. § 1951: Interference with Commerce by Threats or Violence.

2.    This affidavit is also made in support of an application for a warrant to search the following residence (the "SUBJECT PREMISES"), as described more fully in Attachment A-1: the residence located at 5136 Topanga Canyon Boulevard, Woodland Hills, California 91364, which is believed to be CHO's primary residence.

3.    This affidavit is also made in support of an application for a warrant to search the following person, as described more fully in Attachment A-2: CHO.

4.    This affidavit is also made in support of an application for a warrant to search the following vehicle ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-3: a 2020 black Mercedes Benz with four doors bearing California license plate number A113M0 and vehicle identification number W1KUG8DB4LA558591, which is registered to Yoan Koh ("Koh"), but believed be solely used by CHO.

5.    This affidavit is also made in support of an application for a warrant to search the following vehicle ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-4: a 2022 black Harley Davidson bearing California license plate

number 25R1400 and vehicle identification number
1HD1YGK24NB011503, which is registered to CHO.

6.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. § 371 (conspiracy to commit extortion), 18 U.S.C. § 1951
(interference with commerce by threats or violence), 18 U.S.C
§ 924(c) (use of a firearm in furtherance of a crime of
violence), and 18 U.S.C. § 2119 (carjacking) (the "Subject
Offenses"), as described more fully in Attachment B.
Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by
reference.

7.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

8.    I am a Special Agent with the Homeland Security
Investigations ("HSI") and have been so employed since March
2020.  I am currently assigned to the office of the Assistant
Special Agent in Charge Los Angeles International Airport
("LAX") office where I am assigned to investigate a range of

crimes to include money laundering, extortion, and other violent crime related violations.

9.    My formal education consists of a bachelor's degree from Columbia University and a certificate in continuing legal education from Georgetown University.  From May 2021 to September 2021, I attended the HSI Special Agent Academy, a criminal investigations academy conducted at the Federal Law Enforcement Training Center located in Brunswick, Georgia.  At the HSI Academy, I was trained in all aspects of conducting criminal investigations and received several hundred hours of comprehensive, formalized instruction for investigating violations of customs and immigration law, to include offenses involving violent crimes, extortion and racketeering, money laundering, drug trafficking, and conspiracy.

10.   As an HSI Special Agent, I have received training in the areas of arrest procedures, the execution of searches and seizures, and various other criminal laws and legal procedures. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants. Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the investigations in which I have been involved.

11.   Based on my training and experience, I am familiar with the methods of operation used for the facilitation of individuals to engage in extortion, robbery, and related violent

criminal activity, as well as the collection of proceeds of such activity and methods of money laundering used to conceal the nature of the proceeds.

### III. __SUMMARY OF PROBABLE CAUSE__

12.  In or around March 2022, HSI received information from the Los Angeles Police Department ("LAPD") regarding CHO's involvement in an organization that is currently extorting businesses and individuals in the Koreatown, Los Angeles, area. Through interviewing witnesses, including CHO's victims, HSI learned that CHO is charging karaoke bars and doumi[1] a monthly "protection fee" (or unlawful debt).

13.  To further his extortion scheme, CHO committed shootings, a carjacking, a kidnapping, and other acts of physical violence.  CHO made explicit threatening statements to the doumi drivers and karaoke bar owners to get them to pay a monthly fee.  CHO also would restrict doumi drivers from going to certain karaoke bars if they refused to pay the monthly fee. Since karaoke bars rely on the availability of doumis for their businesses to survive, they would comply.

### IV. __STATEMENT OF PROBABLE CAUSE__

14.  Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I know the following facts:

---

[1] From my experience speaking with people in the karaoke industry, I know that "doumi" is a colloquial word for a hostess/companion that gets paid by the patron of the karaoke bar to accompany them.

### A.   LAPD Informed HSI that CHO Is Extorting Individuals and Businesses in Koreatown

15.   In or around March 2022, HSI received information from LAPD regarding CHO's involvement in an organization that is currently extorting businesses and individuals in the Koreatown, Los Angeles area.  Through social media accounts of Grape Street Crips ("GSC") gang members, as well as witness statements of CHO alleging his membership in GSC, CHO was identified as being a member of GSC.

16.   In addition, LAPD provided a contact for a confidential source (the "CS").[2]  The CS stated that CHO is currently charging karaoke bars and doumi a monthly "protection fee" (or unlawful debt).  The information derived from the CS was validated through interviews of a karaoke bar owner, as well as other doumi drivers.

17.   From my training and experience and conversations with senior investigators, I know that gang members often call the charge a "protection fee" to local businesses to justify the extortion under the guise of keeping other gangs and/or individuals from causing problems for the businesses.

---

[2] The CS is not an official HSI confidential informant, but has been unofficially providing LAPD reliable information, without monetary compensation, that has led to multiple seizures for the past two and a half years.  The CS's only arrest was in March 2019, in the Koreatown area of Los Angeles, California. LAPD had arrested the CS for violating California Business and Professions Code Section 7583.3 by failing to carry a valid and current security guard registration card while on duty.  Much of the information provided by the CS has been corroborated by further investigation.  I believe that the information provided by the CS is credible and reliable.

**B. Law Enforcement Identified the SUBJECT PREMSISES as CHO's Current Residence and SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 as CHO's Current Vehicles**

18. Bank of America records associated with CHO's accounts show DoorDash Inc. orders.

19. DoorDash Inc. records for CHO's account show orders going to 5136 Topanga Canyon Boulevard, Woodland Hills, California 91364, which is the address for the SUBJECT PREMISES.

20. On or about February 9, 2023, at approximately 12:15 p.m., HSI LAX established fixed surveillance of the SUBJECT PREMISES and observed SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 in the driveway. On or around the evening of February 16, 2023, HSI LAX observed SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 at the SUBJECT PREMISES and observed CHO exiting the SUBJECT PREMISES, getting into SUBJECT VEHICLE 1, and driving away.

21. On or about February 2, 2023, the Honorable Maria A. Audero of the Central District of California issued a warrant (2:23-mj-00492-DUTY) to obtain cell-site information and phone location information related to CHO's telephones. The cell-site data obtained under that warrant is consistent with CHO living at the SUBJECT PREMISES and using SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 as his vehicles.

22. SUBJECT VEHICLE 1 is registered to Koh with a Los Angeles address that matches the address listed in subscriber information records for phone numbers belonging to CHO. Koh is believed to be CHO's uncle. CHO is believed to be the sole user of SUBJECT VEHICLE 1, and records from Bank of America

corroborate that CHO is currently making monthly payments to
Mercedes Benz Financial.  SUBJECT VEHICLE 1 is a Mercedes Benz.

23.  CHO is listed as the registered owner for SUBJECT
VEHICLE 2 with another Los Angeles address.

24.  From my training and experience, I know that
individuals typically use addresses and names of family members
as signatories so that they can conceal their property and/or
current locations from being discovered.  CHO has utilized
various names for his addresses in addition to using various
addressees for his different phone subscriptions and bank
accounts, which match the address to which SUBJECT VEHICLE 1 is
registered.

**C.    Extortion of Y.S. (Victim 1) and J.L. (Victim 2), and
        Beating and Carjacking of Y.S.**

25.  On or about March 18, 2022, I interviewed Y.S. (Victim
1), whose name LAPD had provided to HSI along with other
information about CHO's extortion.  Y.S. said that he was
previously employed as a doumi driver with his business partner
J.L. (Victim 2) and was first approached by CHO while dropping
off doumis at the parking lot in one of the karaoke bars in or
around July 2019.  Y.S. stated that CHO approached Y.S. and said
that if Y.S. and J.L. wanted to continue to do business, then
they must start paying CHO protection fees.

26.  Y.S. told me that Y.S. and J.L. paid CHO on or about
the 15th of every month.  Y.S. also stated that they paid CHO
via Venmo or cash, and Y.S. provided me CHO's Venmo account
username along with screenshots of the transactions that Y.S.

and J.L. paid to CHO.  I also reviewed Venmo records, which show transactions on January 12, 2021, at 11:46 p.m. and February 15, 2021, at 9:55 p.m., corresponding with the screenshots of Y.S. and J.L.'s previous extortion payments.

27.  Y.S. said that earlier in 2021, CHO approached Y.S. and told Y.S. that he was raising the protection prices, but Y.S. refused to pay the price increase.  On or about May 8, 2021, CHO approached Y.S. with an unidentified male, and CHO and the unidentified male pulled Y.S. out of Y.S.'s vehicle and assaulted Y.S. with baseball bats.  Y.S. heard CHO telling the unidentified male to "fuck him up."  CHO and the unidentified male broke Y.S.'s left arm and caused him to need stitches for a laceration to his lower left leg.  CHO and the unidentified male also inflicted multiple lacerations, abrasions, and bruising on Y.S.'s legs and hips.

28.  Y.S. told me that CHO was wearing a mask with a skeleton graphic during the attack, but Y.S. could immediately identify CHO by the rest of CHO's face that was visible to Y.S. and CHO's voice.  In addition, Y.S. provided me a screenshot of a photo that CHO posted to his social media account shortly after the incident with what appears to be the exact mask that Y.S. said that CHO wore during the assault.

29.  From my training and experience, I know that individuals engaged in criminal activity tend to wear masks and dark colored clothing in an attempt to conceal their identities but can be identified via voice and other facial features unique to the perpetrator.  From my training and experience, I also

know that individuals engaged in extortion are likely to keep masks, weapons, and articles of clothing used in an assault or extortion inside of the residence where they are currently residing.

30.  In addition to a statement from an LAPD police report, J.L. told me that J.L. was on the phone with Y.S. prior to the attack and stated that J.L. heard Y.S. yelling, "I will pay!  I will pay!"  J.L. continued to hear Y.S. screaming and the sound fading, causing J.L. to believe that Y.S. was being dragged away.

31.  After attacking Y.S., CHO took Y.S.'s vehicle, a 2019 Black Honda Odyssey bearing California license plate 8HRA231 and vehicle identification number 5FNRL6H50KB068238 from Y.S.  The vehicle was a rental from "Highlight Rental Car," and records reflect that the vehicle was manufactured in Lincoln, Alabama. CHO took this vehicle by force and violence, or by intimidation, and intended to cause serious bodily harm or death, evidenced by his use of baseball bats to, according to what Y.S. heard CHO say during the attack, "fuck [Y.S.] up."  Y.S.'s vehicle was later recovered at a separate location.

32.  After the attack and carjacking, J.L. picked up Y.S. The two of them filed a police report, and Y.S. was transported to the hospital.

33.  In addition to photos of the injuries that CHO and his accomplice inflicted on Y.S., Y.S. provided me closed-circuit television (CCTV) footage from McQueen Karaoke, located at 820 North Western Avenue, Los Angeles, California 90029, from May 8,

2021.  I reviewed the footage, which showed an individual who appears to be CHO assaulting Y.S.

34.  From my training and experience, I know that gang members who extort individuals will carry out "punishments" upon those who do not comply with their demands in order to gain compliance and set an example to other extortion victims of what could happen to them if they do not comply.

35.  In or around July 2021, Y.S. and J.L. began receiving text messages from an unknown number that they understood to be threats.  Those text messages addressed the victims' family members, home addresses, and vehicle identification numbers.  The text messages would state, "I know where you live" and "see u."

36.  From my training and experience, I know that individuals engaged in extortion will send threatening messages from "burner" phones, applications, and/or other means of masking their identity and typically resort to threatening members of the victims' families.

37.  After CHO's attack on Y.S. and after receiving the threatening text messages, Y.S. and J.L. closed their business.  J.L. also fled to another state with his family.

D.  **Kidnapping of a Doumi Driver**

38.  On or about August 19, 2022, I interviewed a source of information (the "SOI"),[3] whom LAPD referred to me.  The SOI was

_____

[3] The SOI is not an official HSI informant.  HSI came into contact with the SOI during an LAPD arrest of the SOI for carrying a concealed weapon in or around August 2022, which LAPD
*(footnote cont'd on next page)*

previously acquainted with CHO but has since had an estranged relationship with CHO because he would accuse the SOI of "being a snitch."  The SOI currently runs a doumi company and stated that the SOI has paid CHO extortion payments via Venmo and cash in the past.

39.   The SOI referenced the incident between CHO and Y.S. that occurred at McQueen Karaoke and stated that the SOI has personally heard CHO bragging about the incident.

40.   In another instance, the SOI stated that CHO explicitly admitted to kidnapping a separate doumi driver to "send a signal" to the company.  The SOI knows the doumi driver who was kidnapped, and that driver told the SOI that he was kidnapped.

**E.   Assault with a Deadly Weapon and Shooting of a Doumi with Victim 3**

41.   On or about August 5, 2022, I interviewed another victim ("Victim 3"), whom I was able to locate through an LAPD police report that was filed on July 15, 2022.  Victim 3 stated that on July 15, 2022, CHO was involved in a shooting near a vehicle that Victim 3 was driving near the "On and Off Karaoke" parking lot.

42.   Victim 3 stated that on July 15, 2022, he pulled into the On and Off Karaoke to drop off two doumis at approximately

---

told me the City Attorney's Office may be filing charge(s) for. The SOI voluntarily agreed to provide information on CHO to separate himself from any accusations of being a co-conspirator of CHO.  In addition, in or around 2015, the SOI was administratively separated from the military for making and uttering worthless checks, larceny of private funds, and failure to pay just debt.

1:30 a.m. and was approached by an individual whom Victim 3 identified as CHO. Victim 3 stated that CHO was wearing a mask covering the lower portion of his face. Victim 3 stated that he has met CHO on a separate occasion, so Victim 3 was able to recognize him despite the mask that the CHO was wearing.

43. Victim 3 stated that CHO approached the vehicle, opened the door to the vehicle, and came halfway inside. Victim 3 stated that CHO appeared to have "something in his waistband." Victim 3 stated that CHO told him that his company was not allowed to drop off doumis at that location and they had to leave. CHO departed, and once the doumis got back into the vehicle, all three individuals departed the parking lot as well. Victim 3 stated that as soon as the car pulled onto the street, he heard gun shots and glass breaking in the vehicle. Victim 3 stated that he looked back and saw that one doumi was bleeding from a gunshot wound to the neck. This incident is currently under investigation by LAPD.

44. From my training and experience, and conversations with other law enforcement officers, I know that firearms used in the commission of a crime are typically stored at the residence where the individual currently resides. Unlike individuals engaged in the illegal distribution of drugs that sometimes utilize "stash houses" to separate themselves from evidence of the crime, firearms are typically kept at the individual's residence so that they are easily accessible in the event that they are needed.

12

**F.    Assault and Battery of D.E. (Victim 4)**

45.   According to a law enforcement report, on or about September 17, 2022, at approximately 2:35 a.m., LAPD officers received a call for a battery investigation to meet D.E. (Victim 4) at Hollywood Presbyterian Hospital, located at 1300 North Vermont Avenue, Los Angeles, California 90027.  D.E. was being treated for injuries to the left side of his face.  In addition, the SOI called HSI immediately following the incident.  HSI advised the SOI to call LAPD and file the report.

46.   According to a law enforcement report, D.E. told officers that he was at a karaoke bar located on 3rd Street and Ardmore Avenue, parked in the driver seat of his vehicle.  D.E. stated that the suspect opened the driver side of the door and asked, "What company do you work for?"  The suspect punched D.E. in the face, and D.E. fled the location in his vehicle.

47.   According to a law enforcement report, D.E. identified the suspect as being "DK," which is CHO's alias.

**G.    Assault and Theft of Victim 5**

48.   On or about January 26, 2023, I met with an additional victim ("Victim 5").  Victim 5 was referred to me by Y.S. and J.L.  Victim 5 stated that he has been paying CHO a monthly fee for approximately four years but had recently decided to stop paying.  I also reviewed Venmo records, which show payments that Victim 5 had been making to CHO.

49.   According to Victim 5, on or about January 24, 2023, he was sitting in his vehicle when CHO approached and physically assaulted him.  CHO also stole approximately $1,000 from him.

50.   Subsequently, on or about January 25, 2023, Victim 5 resumed paying CHO due to fear for his safety.  Specifically, on that date, Victim 5 paid CHO $400 via Venmo.  Victim 5 stated that in previous messages from CHO, CHO referenced the assault that occurred at McQueen Karaoke on the doumi driver who refused to comply as a means of coercion to get the companies to comply.

51.   Victim 5 agreed to assist law enforcement by wearing recording devices and allowing HSI LAX to observe the next payment that Victim 5 would be making to CHO in order to gather additional evidence.

**H.    Extortion Payment from Victim 5**

52.   On or about February 14, 2023, CHO messaged Victim 5 via KakaoTalk messaging app to collect the monthly extortion payment.  Victim 5 typically pays CHO via Venmo, but at HSI's direction, Victim 5 told CHO that the account was locked and asked if Victim 5 could pay in cash in person on February 16, 2023, to which CHO agreed.

53.   Victim 5 informed me that CHO typically takes Venmo, but prior to the COVID-19 pandemic, he typically collected cash payments.  Victim 5 stated that other drivers and karaoke bars pay cash from time to time, so the request to make a cash payment would not raise any suspicions.

54.   On February 16, 2023, HSI LAX set up an operation to observe and surveil the interaction, which I participated in with others who also provided me information throughout the operation.

55.   At approximately 4:15 p.m. on February 16, 2023, HSI LAX did a check on the SUBJECT PREMISES.  HSI LAX observed that SUBJECT VEHICLE 2 was present at the address.

56.   At approximately 6:30 p.m. on February 16, 2023, HSI LAX established fixed surveillance of SUBJECT PREMISES.  HSI LAX observed SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 at the SUBJECT PREMISES.  HSI LAX also observed an Asian male walking a dog into the residence, whom the agents identified as CHO.  Current cell-site data on CHO's phone number 305-699-1313 from that timeframe reflected that CHO was in that vicinity, as well.

57.   At approximately 9:11 p.m. on February 16, 2023, HSI LAX observed CHO exiting the SUBJECT PREMISES, getting into SUBJECT VEHICLE 1, and driving onto Highway US-101 South.  At approximately 9:40 p.m., HSI LAX lost sight of SUBJECT VEHICLE 1, which was last seen exiting Highway US-101 South onto Gower Street.  Cell-site data on CHO's phone number from that timeframe reflected that CHO was traveling in that direction, as well.

58.   At approximately 9:44 p.m., CHO messaged Victim 5, "I'll see u at P1?  10pm?" which Victim 5 understood to mean the P1 level of the parking garage for Recital Karaoke, located at 3500 West 6th Street, Los Angeles, California 90020.

59.   At approximately 9:55 p.m., HSI LAX Special Agents arrived in their vehicle and parked on level P1 of the parking garage at Recital Karaoke for surveillance.  Cell-site data on CHO's phone number reflected with 88m uncertainty that CHO was in the vicinity of 34.065202, --118.301532, which is an

approximate location of 5th Street and Ardmore in Koreatown, Los Angeles.

60.   At approximately 10:00 p.m., CHO texted Victim 5, "u called cops?"  Through the CS and KakaoTalk group chat that Victim 5 is in with other karaoke businesses, HSI LAX discovered that the vehicle that Special Agents were in was identified as an undercover police vehicle.

61.   At approximately 10:06 p.m., CHO messaged Victim 5 and changed the meeting location to Beau Karaoke located at 345 South Western Avenue, Los Angeles, California 90020.  At approximately 10:15 p.m., HSI LAX Special Agents parked in multiple vehicles around Beau Karaoke.  Cell-site data from that timeframe reflects that CHO was in the vicinity.

62.   At approximately 10:18 p.m., CHO changed the meeting location to 100 North Larchmont Blvd., Los Angeles, California 90004.  At approximately 10:25 p.m., HSI LAX set up fixed surveillance around 100 North Larchmont Boulevard, Los Angeles, California 90004.  HSI LAX observed SUBJECT VEHICLE 1 driving by and making a U-turn.  Current cell-site data reflected that CHO was in that vicinity, as well.

63.   At approximately 10:29 p.m., CHO told Victim 5 to give the cash to an intermediary instead, and Special Agents lost sight of SUBJECT VEHICLE 1.  At approximately 11:13 p.m., Victim 5 asked another doumi driver to Venmo $500 to CHO for Victim 5. In return, Victim 5 would give the cash to the doumi driver. Cell-site data from that timeframe reflected that CHO was back in or around SUBJECT PREMISES.

64.   From my training and experience, I know that individuals involved in criminal activity will often utilize counter surveillance if they suspect that they are being followed by law enforcement.  In particular, they may make multiple U-turns, change locations, and/or set up meeting locations on deserted streets where they can observe various vehicles that enter and exit.

65.   At approximately 11:40 p.m., HSI LAX observed Victim 5 meeting with the intermediary on Ardmore and 6th Street in Los Angeles, California to give him the cash.

66.   At approximately 1:00 a.m. on February 17, 2023, HSI LAX observed that SUBJECT VEHICLE 1 was back at SUBJECT PREMISES.  CHO's cell-site data reflected the same.

67.   Victim 5 provided me screenshots of Kakao messages with CHO from February 14, 2023, through February 16, 2023, corroborating the facts and the timeline of events.  In addition, Victim 5 provided me the Venmo transaction screenshot from the intermediary who paid CHO via Venmo.

68.   From my training and experience and conversations with other law enforcement officers, I know that individuals engaged in extortion will keep the proceeds at the location that they are currently residing to safeguard it from theft and/or easily access the funds.  In addition, they will hold onto the proceeds so that they can later deposit it into an account.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

69.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CHO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

70.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.   REQUEST FOR NIGHT SERVICE

71.  I further request that the Court authorize investigators to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  As noted above, CHO is suspected of utilizing means of violence and utilizing firearms to further his extortion scheme.  Through

victim accounts and information learned during the investigation, CHO is likely to be armed with a firearm.  As a result, law enforcement currently plans to use at least one federal Special Response Team (SRT) -- teams akin to Special Weapons and Tactics (SWAT) teams used by local law enforcement -- to make entry and secure the **Subject Premises** at or around 4:00 a.m. on March 16, 2023.  The government, however, is seeking night service for all warrants so that the searches may begin at the same time.  Based on my training and experience, when warrants are being executed in connection with violent crimes it is critical to execute such warrants at approximately the same time to avoid destruction of evidence, protect law enforcement personnel during the searches, and to prevent potential co-conspirators from fleeing search locations after being tipped off about law enforcement operations.  Given the nature of the investigation and aggravating factors involved, I believe that nighttime service is warranted in this case.

//

//

## VII. <u>CONCLUSION</u>

72.   For all the reasons described above, there is probable cause to believe that CHO has committed a violation of 18 U.S.C. § 1951: Interference with Commerce by Threats or Violence. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1, the person described in Attachment A-2, SUBJECT VEHICLE 1 described in Attachment A-3, and SUBJECT VEHICLE 2 described in Attachment A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  9th  day of
March, 2023.

_____
HONORABLE MICHAEL A. WILNER
UNITED STATES MAGISTRATE JUDGE